IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

DUANE and DONNA KERNS, individually,      )
and as the next of kin of and natural parents  )
of Colton Kerns, a deceased minor,             )
                                               )
        Plaintiffs,                            )
                                               )
vs.                                            )        Case No. 13-CV-290-TCK-PJC
                                               )
INDEPENDENT SCHOOL DISTRICT                    )
NO. 31 OF OTTAWA COUNTY,[1]                    )
MARK ALEXANDER, individually                   )
and in his official capacity,                  )
                                               )
        Defendants.                            )

## OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 37). For reasons

explained below, the Court grants summary judgment on the constitutional claim and denies summary

judgment on the negligence claim.

## I.    Procedural History

This suit was brought in state court by Plaintiffs Duane and Donna Kerns ("Parents"),

individually and as the next of kin and natural parents of their deceased son, Colton Kerns ("Colton"),

against Independent School District No. 31 of Ottawa County ("School District") and Superintendent

Mark Alexander ("Alexander") ("Defendants"). Colton died in a one-vehicle rollover accident after

being released from a school function by Alexander, as explained in more detail in Part II. Parents

assert a 42 U.S.C. § 1983 claim for violation of Colton's Fourteenth Amendment rights against

Alexander and School District ("constitutional claim") and a negligence claim against School District

_____

        [1] Plaintiffs originally sued "Fairland School Board." On July 1, 2013, the Court granted
Plaintiffs' motion to substitute this defendant with the properly named defendant, Independent
School District No. 31 of Ottawa County.

("negligence claim"). Parents seek both actual and punitive damages. Following removal, Defendants moved to dismiss the constitutional claim and any claim for punitive damages. The Court dismissed the claim for punitive damages against the School District but otherwise denied the motion. *Kerns v. Indep. Sch. Dist. No. 31 of Ottawa Cnty.*, 984 F. Supp. 2d 1144, 1155 (N.D. Okla. 2013). School District did not move to dismiss the negligence claim, and the Court did not issue any rulings on such claim.

In denying the motion to dismiss, the Court issued four holdings. First, the Court held that Parents' allegations were sufficient to state a "danger-creation" claim, which is a type of Fourteenth Amendment substantive due process claim predicated on reckless or intentional injury-causing state action which shocks the conscience. *Id.* at 1149 (citing *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262 (10th Cir.1998)). Addressing Defendants' challenge to the first element of a danger-creation claim – whether Alexander's alleged conduct created or increased the danger to Colton – the Court reasoned that "Alexander allegedly made affirmative decisions and took affirmative actions that impacted the situation in a manner that at least potentially increased the danger Colton faced, and this states a plausible claim of 'danger creation' under Tenth Circuit law." *Id.* at 1150. Addressing Defendants' challenge to the sixth element of a danger-creation claim – whether Alexander's alleged conduct was conscience shocking to federal judges – the Court concluded that Defendants' allegations were sufficient to survive a motion to dismiss but cautioned that "federal law imposes an extremely high standard, and that the record evidence must be particularly egregious in order to shock the conscience." *Id.* at 1152.

Second, the Court rejected the School District's argument that only a school board, and not a superintendent, may be deemed a final policymaker for purposes of imposing municipal liability

upon an Oklahoma school district. *See id.* at 1153.[2] Third, the Court rejected Alexander's argument

that he was entitled to qualified immunity due to the lack of any clearly established constitutional

right. The Court reasoned that "the alleged facts are close enough to *Armijo* to survive a Rule

12(b)(6) motion as to whether Alexander was on notice that his conduct could violate a constitutional

right." *Id.* at 1155 (explaining similarities between *Armijo* and Parents' alleged facts). Finally, the

Court held that Parents could not recover punitive damages on their constitutional claim against the

School District. *Id.* at 1155. The parties conducted discovery, and Defendants now move the Court

for summary judgment on both the negligence and constitutional claims.

## II.  Summary Judgment Record

Viewed in a light most favorable to Plaintiffs, the summary judgment record contains the

following facts. Colton was a junior at Fairland High School, where Jerry Johnson ("Johnson") was

the principal. On Friday, April 20, 2012, Colton picked up his friend and classmate Beth Ann Burch

("Beth Ann"). Colton was driving his father's Chevy truck ("Chevy"). Colton's own truck was a

smaller Mitsubishi truck ("Mitsubishi"), which was at his home in Grove, Oklahoma ("Grove home").

Colton and Beth Ann arrived at Fairland High School around 8:00 a.m., along with some other

classmates. Classes were not in session, but juniors were at school to decorate for the prom the next

day.[3] While Beth Ann went to another car, another student and friend of Colton's, Keith Gurley

---

[2]  The Court did so despite Parents' failure to allege any specific basis for municipal
liability in their Complaint or adequately address the issue of municipal liability in their response
brief. The Court *sua sponte* permitted Parents to amend their Complaint to add a basis for
municipal liability – namely, that Alexander acted as an official with final policymaking
authority as to the decision in question. *See id.* at 1152. On November 4, 2013, Parents filed a
First Amended Complaint including such allegations. (First Am. Compl. ¶¶ 36-38.)

[3]  There is no dispute that prom decorating was a school-sponsored event.

("Keith"), got into the Chevy. Colton had a half-gallon bottle of vodka in the floor board of the Chevy. Colton and Keith made mixed drinks of vodka and orange pop and remained in the car for close to an hour. When a teacher arrived and opened the cafeteria, the students went inside. Two teachers, Gala Miller ("Miller") and Alisha Brodrick ("Brodrick"), supervised the prom decorating process.

Around 10:00 a.m., Miller ironed tablecloths with Colton and did not notice any suspicious behavior. Sometime before lunch, Colton and Keith went back to the Chevy to drink more alcohol. Sometime around noon, Miller left to pick up pizza for lunch. When leaving, Miller observed Colton and Keith sitting in the Chevy and told them to get back inside. While Miller was gone, a student named Lauren ("Lauren") reported to Brodrick that Colton was acting different and smelled like alcohol. Brodrick went outside to her vehicle to call Miller and seek guidance.[4] Before she made the call, she observed Colton and Keith in the Chevy driving too fast while moving items to a nearby school building. She then called Miller and reported Lauren's suspicion. Miller said she was on her way back and would report the problem to Alexander when she returned.[5] While awaiting Miller's arrival, Brodrick ordered Colton and Keith to come inside. During this time, Brodrick engaged in conversation with Colton and smelled alcohol on him.

After delivering the pizza to the cafeteria, Miller went to Alexander's office. Miller did not conduct any investigation, and it does not appear that Brodrick told Miller she had smelled alcohol

---

[4] Brodrick was a first-year teacher, and Miller had been a teacher for thirteen years.

[5] Miller knew Alexander was present on school grounds because she had requested the presence of an administrator in case of any problems.

on Colton.[6]  Regarding her conversation with Alexander, Miller testified:  "I went into [Alexander's] office and I - I think I said something like, 'We have a problem.'  And I told him what [Brodrick] told me, and then he and I walked back over to the cafeteria together."  (Miller Dep. 21:6-9.)[7]  In reporting Colton's suspected drinking to Alexander, Miller followed state law and the School District's policy.  *See* Okla. Stat. tit. 70, § 24-138 (requiring teacher to report suspected alcohol use by a student to the school principal or his designee); Fairland School District Policy, Ex. 3 to Defs.' Mot. for Summ J. (same).  Alexander testified that he did not ask Miller any questions about why she suspected Colton of drinking.

Upon arriving in the cafeteria, Alexander did not speak with Brodrick or any other students. He immediately took Colton into a laundry area off the cafeteria and partially closed the door, where they remained for five to ten minutes.  According to Alexander, Colton did not smell of alcohol, was steady on his feet, and had clear eyes.  Also according to Alexander, Colton initially denied drinking, denied having any alcohol with him, and did not know why others suspected he was drinking.  Later during the conversation, Colton allegedly admitted that he had a drink before he came to school but still denied having any alcohol with him.[8]  Alexander further testified:

---

[6]  Thus, it does not appear that Miller knew this fact when she made her report to Alexander.

[7]  Alexander denies that Miller told him that Lauren had reported smelling alcohol on Colton or that Miller told him she witnessed Colton and Keith sitting in the Chevy, before she left to get pizza.  Construing the record in favor of Parents, Alexander had knowledge of both facts.

[8]  Parents have moved to exclude Alexander's statements regarding what Colton said to Alexander as inadmissible hearsay.  The Court need not resolve that question now because (1) the negligence claim creates a jury question regardless of whether that testimony is included or excluded, and (2) Alexander's conduct does not rise to the level of conscience-shocking regardless of whether that testimony is included or excluded.

> I believed Colton to be a very truthful, honest person . . . . And I said, okay, since you have told me the truth, we won't involve anybody else. I don't observe any signs of you being under the influence of anything, but you will need to go home and you will not be able to come to the prom. And I said, is there anyone who can take you home? And he said Beth and Keith could take him home. He seemed to understand. He seemed fine. Again, . . . he still did not show any signs of being intoxicated. And so, I believed we just needed to remove him from the situation, and that if indeed he had a drink before he came to school, then we probably needed to keep him from coming to the prom. And out of an abundance of caution, I stepped outside, and Keith and Beth were there, and I said, can you take him home? And Keith said he needed to go to Colton's house to pick up his truck, and Beth said she needed to leave . . . . So I thought it was a perfect fit, and they took him home.

(Alexander Dep. 112:11-113:12.) In contrast to Alexander's testimony, Keith testified that he thought it would have been obvious to Alexander that Colton was drinking, and that he knew Colton was tipsy because he was acting happy-go-lucky and in a good mood. Beth Ann testified that, upon ordering them to take Colton home, Alexander indicated that Colton should not drive. No witness testified that Colton exhibited any obvious signs of intoxication, such as slurring his speech or walking in an unsteady manner.

During the conversation in the laundry room, Alexander disciplined Colton by prohibiting him from attending prom. Although Alexander denies that he also suspended Colton, there is ample evidence calling this testimony into question. The testimony of Parents, Johnson, Keith, Beth Ann, and Oklahoma Highway Patrolman Ruben Hernandez ("Trooper Hernandez") could lead a jury to conclude that Alexander suspended Colton rather than merely warning him of a possible suspension.

Prior to the students' departure from school grounds, Alexander did not conduct any further investigation to determine why (and at what time) others suspected Colton of drinking and did not conduct any investigation as to whether Keith or Beth Ann had been drinking. Alexander did not attempt to contact Colton's parents prior to ordering Colton to leave school grounds. Once back in

his office, around 1:00 p.m., Alexander called Johnson (who was at home) and told Johnson about the incident with Colton.  Construed favorably to Parents, Johnson's testimony indicates that Alexander instructed Johnson to contact Colton's parents for the purpose of discussing discipline but not specifically for the purpose of telling them Alexander ordered him to leave with Keith and Beth Ann.  (Johnson Dep. 84:15-886:17.)  Johnson immediately called Parents but was unable to reach them.  He left a message on their home phone stating that Colton had "been caught drinking by the superintendent at the school" and to call Johnson back.  (*Id.* 109:11-16.)

Meanwhile, Colton was in the parking lot after his meeting with Alexander.  According to Parents, Colton called his home and told his father he had been suspended for drinking.  His father told him to stay at the school until Parents arrived.  Parents immediately left for the school, which is about a twenty minute drive.  This conversation between Colton and Parents appears to have occurred before Colton knew Alexander was requiring him to leave school grounds with Keith and Beth Ann.

Keith and Beth Ann then found Colton to take him home in the Chevy, as instructed by Alexander.  Colton was visibly upset and punched the Chevy before they left.  The three students left the school in the Chevy, with Keith driving, Colton in the passenger seat, and Beth Ann in the back seat.  At Colton's request, Keith headed to property owned by Colton's family in Fairland ("Fairland property"), which was about a ten to twenty minute drive from the school to the Fairland property.  On the way to the Fairland property, Colton called his parents and told them that Alexander ordered him to leave the school.  Parents then stopped driving to the school and tried to discover where the students were headed.  At some point, Keith informed Colton's father that they were on their way to the Fairland property.  Colton's father told Keith to keep Colton there until Parents arrived.

At the Fairland property, Colton was throwing a fit – crying, yelling, slinging his arms around, and throwing barrels.   Keith testified as follows regarding what occurred at the Fairland property:

> [Colton] ended up in the driver's seat, and was upset and didn't want to go home. And we was sitting in the truck and I was trying to reason with him, and I got – his phone went off . . . . And it was his dad, I believe, and I answered it.  And they was worried about him, you know, get home.  And he said he wasn't going home.

(Gurley Dep. 29:19-25.)   Although Keith and Beth Ann tried to reason with him, Colton said he would either take them home or leave them.  Colton did not seem intoxicated to Keith at this time, just more scared.  Keith does not remember Colton drinking any more of the vodka on the way to the Fairland property.  As they were leaving the property, he threw the vodka bottle out the window. Keith testified that there was some left in the bottle but does not recall how much.  Colton then drove Keith and Beth Ann to Fairland and dropped them off near their homes.  At some point after dropping off Keith and Beth Ann in Fairland, Colton apparently went to the Grove home, dropped off the Chevy, and left again in the Mitsubishi – the vehicle in which Colton later had the accident.

Sometime before 2:00 p.m., Johnson tried calling Parents again.  By this time, Johnson was at the school to drive the baseball team to an away game.  Johnson called from Alexander's office and reached Colton's father.  Johnson told Colton's father that "there would be a long-term suspension that would have to be fulfilled" and that Colton "would not be allowed to go to the prom."  (Johnson Dep. 121:7-13.)  Colton's father expressed concerns about the length of the suspension, and they made an appointment on Monday morning.

When Parents arrived at the Fairland property, the students were gone.  Parents then went to Beth Ann's house but did not see the Chevy.  Beth Ann later informed Parents that Colton had told her he was headed to their lake property ("lake property") to cool off.  By this time, it was around

2:00 p.m., and Colton's mother needed to get ready to leave for work. Parents returned to the Grove home, and they did not receive any further communications from Colton or his friends.

At 2:22 p.m., Trooper Hernandez received notification from dispatch of a one-vehicle rollover accident and possible death. Sometime before 3:00 p.m., Colton's father headed to the lake property to look for Colton or his vehicle. While speaking with a neighbor, the neighbor informed him there was something on Facebook about an accident. The neighbor contacted law enforcement and informed them that Colton's father was looking for Colton. Around 6:00 p.m., Trooper Hernandez met Colton's father near the lake property and informed him of Colton's death. Trooper Hernandez testified that the accident was a "one-vehicle rollover off of Horse Creek Drive in Delaware County, Oklahoma." (Hernandez Dep. 23:4-6.)

## III.   Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

IV.     **Negligence Claim**

School District moved for summary judgment on the negligence claim.[9]  Under Oklahoma law, "there are three elements to a claim for negligence: 1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care." *Smith v. City of Stillwater*, 328 P.3d 1192, 1200 (Okla. 2014).  "The cornerstone of a negligence action is the existence of a duty, and the issue of whether a duty exists is a question of law." *Id.*

School District argues that Parents' evidence fails to establish the first element – a duty owed by School District to protect Colton from injury.  Relying on the Oklahoma Supreme Court's decision in *Delbrel v. Doenges Brothers Ford, Inc.*, 913 P.2d 1318, 1320-21 (Okla. 1996)*,* School District argues that no duty arose because Colton's accident and death were unforeseeable.  Specifically, School District contends that "Alexander had determined that Colton was not intoxicated" and that "it was unforeseeable that Colton would become emotionally distraught . . . and refuse even his parents' requests that he come home."  (Defs.' Mot. for Summ. J. 23.)[10]

In deciding the question of duty, a court must determine "whether a defendant stands in such a relationship to a plaintiff that the defendant owes an obligation of reasonable conduct for the benefit of the plaintiff."  *Delbrel,* 913 P.2d at 1320-21.  "[W]hether or not a duty exists depends on the

_____

    [9]  This section of Defendants' motion consisted of only two paragraphs at the conclusion of the motion.  The majority of the motion was devoted to the constitutional claim.

    [10]  School District appears to admit that Alexander's actions are imputed to School District for purposes of the negligence claim.  Further, School District does not make any immunity arguments under the Oklahoma Governmental Tort Claims Act.  Therefore, for purposes of this motion, the Court assumes that School District enjoys no immunity and may be held liable for any negligent acts of Alexander.

relationship of the parties and the general risks involved in the common undertaking." *Id.* "The most important consideration in establishing duty is foreseeability" – that is, "whether the defendant's conduct creates a broader 'zone of risk' that creates a general threat of harm to others." *Id.* As aptly explained in *Delbrel*, the foreseeability question related to duty "must not be confused with the foreseeability element of proximate cause." *Id.* at 1322. "Foreseeability as an element of duty of care creates a 'zone of risk' and is a minimum threshold legal requirement for opening the courthouse doors," while "[f]oreseeability as an element of proximate cause is a much more specific factual requirement that must be proved to win the case once the courthouse doors are open." *Id.* In *Delbrel,* for example, the court found that a repair shop owed a duty of care to a passenger of the allegedly negligently repaired vehicle who was struck from behind by a second vehicle while he pushed the negligently repaired vehicle off the road. *Id.* at 1320. The court explained that "the public, of which [the passenger] was a member, is within the zone of risk of negligently repaired vehicles." *Id.* at 1322.

The Court concludes that School District owed Colton a duty of care under the circumstances presented.[11] At the time of Alexander's allegedly negligent conduct, Colton was on school grounds participating in a school function. Colton certainly was not a stranger to Alexander or the School District. Further, state law imposed certain obligations upon Alexander, acting on behalf of School District, once Miller reported Colton's suspected drinking to him. *See* Okla. Stat. tit. 70, § 24-138

---

[11] Parents did not move for summary judgment on this issue and instead argued that questions of fact precluded summary judgment in favor of School District. If duty were a jury question, there certainly would exist questions of fact sufficient to survive summary judgment. *See supra* Part II. However, the first element must ultimately be decided by the Court. The undisputed facts, even construed wholly in favor of School District, demonstrate the existence of a duty. Therefore, in the interest of judicial economy, the Court *sua sponte* grants summary judgment in favor of Parents on the duty element.

(requiring that, upon report by teacher that any student "may be under the influence" of alcohol, a principal or his designee "shall immediately notify the superintendent of schools or designee and a parent or legal guardian of the student of the matter").[12] In addition to general duties imposed upon school officials in an ordinary school setting, specific legal guidelines govern the situation presented in this case – namely, a teacher's report of suspected alcohol use to a school administrator. Therefore, both the school district/student relationship and the statutory obligations arising from Miller's report to Alexander support the existence of a duty owed by School District to Colton.

Second, the Court must consider the allegedly negligent conduct and whether Colton was within its potential "zone of risk." Even construed in favor of Defendants, the record shows that Alexander ordered Colton to leave school grounds with at least some knowledge that Colton had consumed alcohol that day. He was, after all, disciplined for drinking. Alexander decided to release Colton in the vehicle Colton had driven to school under only the supervision of his two friends. Prior to doing so, Alexander did not call Parents or give them an opportunity to pick Colton up at school. Nor did Alexander conduct any investigation to determine the nature and extent of Colton's drinking.[13] Colton had a one-vehicle rollover accident less than two hours after Alexander's allegedly negligent conduct.

---

[12] Alexander was acting as Johnson's designee in this instance and therefore had the obligation to immediately notify Parents.

[13] Had an investigation been conducted, Alexander could have possibly discovered facts informing his decision, including that: (1) Brodrick smelled alcohol on Colton in the hour before Miller's report and observed Colton and Keith driving recklessly, (2) Miller had seen Keith and Colton sitting in the Chevy within the previous hour, (3) the vodka was still in the Chevy, and (4) Keith (Colton's driver) had himself been drinking within the previous two hours.

Under these specific circumstances, Colton was a person within the "zone of risk" created by the allegedly negligent conduct. Colton was in fact the primary person within the zone of risk, along with Keith and Beth Ann. In addition, the accident was not so remote in time, or so factually removed from the alleged negligence, as to negate any duty that may have originally existed upon Colton's release from school. With respect to time, the accident occurred less than two hours following the alleged negligence. With respect to factual circumstances, the accident was caused by Colton's operation of a motor vehicle – at least one risk created by Alexander's allegedly negligent conduct of releasing Colton from school grounds in his own vehicle with two friends after a report of suspected alcohol use. Other events certainly occurred after Colton left school grounds. Colton got the keys from his teenage friends, took control of the Chevy, and then changed vehicles to the Mitsubishi. While these facts will be relevant fact to a jury's determination of proximate cause, they are not sufficient to remove Colton from the foreseeable zone of risk or "close the courthouse" door at the threshold duty inquiry conducted by the Court. *Cf. Wofford v. Eastern State Hosp.*, 795 P.2d 516, 519 (Okla. 1990) (holding that mental institution had general duty to exercise care when releasing mental patients, but that court properly granted summary judgment on duty question because released patient's murder of his stepfather over two years after his release was "too remote to be legally foreseeable" and because hospital did not know and should not have known about patient's violent tendencies prior to release).

Therefore, the Court denies School District's motion for summary judgment, and Parents are granted partial summary judgment on the issue of duty. The duty found by the Court is limited to the precise facts of this case.[14]

## V.     Danger-Creation Claim

In addition to asserting a state-law tort claim, Parents also assert a § 1983 claim based on Defendants' alleged violation of Colton's constitutional substantive due process right to be free of state-created danger. Generally, the Due Process Clause of the Fourteenth Amendment does not impose an obligation on the state to protect individuals from the actions of third parties or the individual himself. *See Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279 (10th Cir. 2003) (explaining that state actors are liable only for their own acts). One exception to this rule applies when state actors create or increase the danger that harms the plaintiff. *See id.* at 1281 (labeling these types of claims as "danger-creation claims"). Danger-creation claims "ultimately rest on the specifics of a substantive due process claim – i.e. a claim predicated on reckless or intentional injury-causing state action which 'shocks the conscience.'" *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262

---

[14]  Some secondary sources – not cited or discussed by School District – have explained that school officials' duties to students generally do not extend beyond school grounds. 18A McQuillin Mun. Corp. § 53:101 ("When an injury occurs off school premises, there can generally be no actionable breach of duty."); *see also Stokes v. Tulsa Pub. Sch.*, 875 P.2d 445, 447 (Okla. Civ. App. 1994) (holding that school district owes no duty to pick up or deliver each student on the side of the street where the student lives, and that it was within injured students' parents' control to "complain to the school or seek information about an alternative bus stop"). However, exceptions may exist where "foreseeable harm arises on school grounds during school hours, even where the actual injury occurs off school grounds." 18A McQuillin Mun. Corp. § 53:101 (citing *Stoddart v. Pocatello Sch. Dist. #24*, 239 P.3d 784, 790 (Idaho 2010) (holding that location of injury off school grounds was not dispositive of duty question where the plaintiffs argued that proper investigation on school grounds would have prevented student's death)). The foreseeable risks in this case arise from Colton's being released from school grounds under the specific circumstances identified above.

(10th Cir. 1998). Liability is imposed based upon the state actors' "culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* at 1263.

The Court grants summary judgment on the danger-creation claim for two reasons: (1) Parents cannot establish the "private violence" precondition, and (2) upon review of the factual record and resolving all factual disputes and credibility assessments in favor of Parents, Alexander's conduct does not rise to the level of conscience-shocking.

## A.     "Preconditions" to Danger-Creation Claim

All briefing before the Court, at the dismissal and summary judgment stages, focused exclusively on the six-part test governing danger-creation claims:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Christiansen*, 332 F.3d at 1281 (internal quotations omitted). In its Order ruling on the motion to dismiss, the Court discussed only these elements. However, the Court has now discovered two "preconditions" to invocation of a danger-creation theory of liability, which are: (1) an act of private violence, and (2) affirmative conduct on the part of the state in placing the plaintiff in danger. *See Estate of B.I.C. v. Gillen*, --- F.3d ----, 2014 WL 3746844, at *5 (10th Cir. 2014) (articulating six-part test and describing other two requirements as "preconditions")*; Hernandez v. Ridley*, 734 F.3d 1254, 1259 (10th Cir. 2013) (same); *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 928 (10th Cir. 2012)

(first clearly identifying two "preconditions" for a danger-creation claim but stating that they were implicit from prior case law and therefore not overruling precedent or articulating new test).[15]

These "preconditions" have not been *explicitly* addressed by the parties or the Court. However, the "affirmative conduct" requirement was raised in Defendants' motion to dismiss in challenging the first element of the six-part test – namely, whether Alexander created or increased the danger causing harm to Colton. The Court addressed the affirmative conduct requirement in its discussion of the first element, *see Kerns*, 984 F. Supp. 2d at 1150, and Defendants did not make any further arguments at the summary judgment stage. Therefore, the Court has adequately addressed the second "precondition." In contrast, the parties have not raised arguments akin to or touching upon the private violence requirement. Because it is a necessary component of a danger-creation theory of liability, the Court now addresses this requirement.

**B.      Private Violence**

The private action in a danger-creation claim – *i.e.*, the action committed by the non-state actor after the state action creates or increases the danger to the plaintiff – "must be a violent one." *Gray*, 672 F.3d at 928 (explaining that "not just any private act will suffice"). At a minimum, "the term 'violence' in its legal sense typically connotes some degree of deliberateness." *Id.* Thus, the private party causing the harm must "act with some degree of deliberateness before a victim's harm is actionable under the state-created danger theory." *Id.* "This is because the harm associated with a negligent act is never constitutionally cognizable under the Due Process Clause." *Id.* Therefore, "*regardless of the circumstances preceding the act*, a negligent act that is directly responsible for

---

[15]   In *Gray*, the Tenth Circuit acknowledged that its six-part "test is prone to generate oversight on the part of courts and counsel alike because it fails to expressly incorporate those preconditions necessary in this Circuit." 672 F.3d at 920 n.8.

causing harm to the victim never constitutes a substantive due process violation because such an act never constitutes a constitutional deprivation of life, liberty, or property." *Id.* at 929. "Reason dictates that if state actors are not answerable under § 1983 for their own negligent acts, they are not answerable under § 1983 where a private party's underlying negligent act is directly responsible for the harm." *Id.* at 929-30. "The rationale is simple: The victim has not suffered a constitutional deprivation in either case." *Id.* at 930. In *Gray*, the Tenth Circuit noted that its previous danger-creation cases – save one involving an accidental drowning that was wrongly decided – involved private actions that could be classified as violent and deliberate. *Id.* at 929 n.16. Examples of violent acts include murder, kidnapping, sexual assault, suicide by gunshot wound, sexual molestation, and child abuse. *Id.* Therefore, *Gray* teaches that where the harm ultimately befalling the victim is a result of *unintentional* conduct by the private party, "the state-created danger theory . . . has no role to play in a proper resolution" of the grievance. *Id.* at 930.

In this case, the private action following Alexander's state action consisted of Colton having a one-vehicle rollover accident in the Mitsubishi. There is no evidence suggesting that Colton purposefully wrecked the car or somehow intended to commit suicide using the vehicle as the weapon. Parents' theory of the case has always been that Alexander's conduct (whether merely negligence or also conscience-shocking deliberate indifference) created or increased Colton's vulnerability to the danger of having a motor vehicle *accident* because: (1) Colton was under the influence of alcohol, (2) angry and upset about being prohibited from attending prom and suspended from school, and (3) ordered by Alexander to leave school grounds under only the supervision of two friends. Parents have never contended that Alexander's conduct created or increased the risk that Colton would attempt to commit suicide.

The Court cannot locate any record evidence indicating that Colton was taking a deliberately "violent" action with the intent of harming himself when he had the rollover accident in the Mitsubishi. Further, the Court can find no indication that Parents, Trooper Hernandez, or anyone else will testify at trial that Colton's car wreck was anything other than an accident, that Colton made any suicidal remarks prior to the accident, or that Colton was aiming his vehicle at an object. Therefore, even if Alexander's preceding state action rose to the level of conscience-shocking deliberate indifference, which it does not, the claim still fails because Colton did not commit a deliberate, violent act against himself. *See Hernandez*, 734 F.3d at 1259 (affirming dismissal of claim where complaint alleged that victim was killed by a private actor's "negligent driving, not by an act of violence").[16]

## C.       Shocks the Conscience

"To rise to the level of a constitutional violation, a deliberately indifferent act must be one which is conscience-shocking – the Supreme Court has acknowledged that not every deliberately indifferent action will rise to the 'constitutionally shocking level.'" *Green v. Post*, 574 F.3d 1294, 1302 (10th Cir. 2000) (quoting *Bublitz v. Cottey*, 327 F.3d 485, 490 (7th Cir.2003)). The "shocks the conscience" requirement is grounded in three principles: (1) restraint in defining the scope of

---

[16] In its Order denying Defendants' motion to dismiss, the Court relied significantly on *Armijo*, which involved a student's suicide by gunshot wound. *See Kerns*, 984 F. Supp. 2d at 1151-52. However, the Court did not rely on *Armijo* because the evidence in this case indicated that Colton intentionally killed himself using a motor vehicle. In relying on *Armijo*, the Court was focusing exclusively on the similarities in the state action by school officials, without concern for whether the private action causing the harm occurred as a result of negligent or intentionally violent conduct. With respect to the private action requirement, there is a glaring difference between *Armijo* and this case – one involved an intentional gunshot wound preceded by suicide threats and the other involved a one-vehicle rollover car accident with no evidence of suicidal tendencies.

substantive due process claims; (2) the concern that state tort law not be replaced by § 1983; and (3) the need for deference to local bodies in making decisions impacting public safety. *See Armijo*, 159 F.3d at 1262. In furtherance of these principles, the Tenth Circuit requires a plaintiff to demonstrate that the state action was not only intentional or reckless but also that it possesses a "degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* The level of conduct "cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). Whether specific conduct shocks the conscience is a question of law for the Court. *See Perez v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005) (citing *Terell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005)); *Uhlrig*, 64 F.3d at 573 (explaining that the standard for judging a substantive due process claim is whether the challenged government action would shock the conscience of federal judges) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992)); *Mason v. Stock*, 955 F. Supp. 1293, 1308 (D. Kan. 1997) ("The conduct must shock the conscience of federal judges. In other words, the 'shock the conscience' determination is not a jury question.") (internal citations omitted).

Construed in a light favorably to Parents, Alexander's conduct could possibly be viewed as deliberately indifferent to certain risks. However, the conduct must also possess a degree of outrageousness and a magnitude of potential harm that is truly conscience-shocking at the moment it occurs. *See Deray v. City of Colo. Springs*, 11-CV-2639, 2013 WL 1149550, at * 8 (D. Colo. March 19, 2013) (examining whether behavior was conscience shocking by "stop[ping] the film" at the moment of the conduct and "[w]ithout knowing the ultimate consequences"). In this case, Alexander made poor choices in his handling of this situation – choices that violated school policy

and possibly prevented Parents from coming to Colton's aid. However, after reviewing the summary judgment record, the Court concludes that the overall facts and circumstances in this case cannot be deemed outrageous or conscience-shocking for three reasons.

First, there was not a conscience-shocking magnitude of potential harm because Alexander took some action to prevent Colton from driving – namely, telling his friends to drive Colton home. Several events had to occur in order for the harm to befall Colton – Colton had to take the keys, take control of the vehicle, and then have a motor vehicle accident. Many times, and perhaps most times, the student would have arrived safely home and/or driven while impaired without having an accident. In this case, Colton did in fact arrive home safely at one point and then made the decision to change vehicles. The risk of danger at the moment of Alexander's conduct, while certainly present, was not an "extremely great risk" that can be deemed conscience-shocking. *See Green*, 574 F.3d at 1303 (explaining that, where there is opportunity for reflection and unhurried judgments, deliberate indifference to an "extremely great risk of serious injury" can shock the conscience).

Second, even construed in favor of Parents, the record does not reflect that Colton was falling down, slurring his words, or otherwise exhibiting signs of intoxication. No witness testified that Colton was exhibiting any of these types of obvious signs of intoxication or alcohol abuse. At most, Colton smelled of alcohol and was acting happy go lucky. This mitigates the outrageousness of Alexander's deliberate indifference and distinguishes the case from *Armijo*, where the extent of the student's mental impairments and suicidal thoughts were documented and clearly well-known to the school decision-makers.[17]

_____

[17] The First Circuit has described *Armijo* as at the "outer limit" of what can be deemed conscience-shocking, *see Hasenfus v. LaJeunesse*, 175 F.3d 68, 74 (1st Cir. 1999), and the overall circumstances presented are less shocking than those presented in *Armijo*.

Finally, in the Court's view, this case aptly demonstrates the need for restraint by the judiciary in defining the scope of substantive due process claims. Colton's death was tragic, and Alexander's conduct could be viewed as a contributing factor in his death. But it is the Court's duty to separate truly conscience-shocking conduct by state actors from conduct that must be addressed by traditional tort remedies. Considering the circumstances as a whole, Alexander's conduct falls short of conscience-shocking, and there is no need for the Court to hear further evidence at trial.[18]

**D.  Qualified Immunity**

"[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Cillo v. City of Greenwood Village*, 739 F.3d 451, 460 (10th Cir. 2013). Based on the above analysis, Alexander's actions did not violate a constitutional right. Alexander is therefore entitled to qualified immunity for the § 1983 claim asserted against him in his individual capacity.

---

[18]  Because there was no constitutional violation committed by Alexander, there is no need to address School District's alternative argument that it is not subject to municipal liability.

## VI.    Conclusion

Defendants' Motion for Summary Judgment (Doc. 37) is DENIED in part and GRANTED in part.  It is denied as to Parents' negligence claim, which was asserted only against School District.  It is granted as to Parents' constitutional claim, which was asserted against School District and Alexander in his individual capacity.  Alexander is no longer a party to the litigation.

SO ORDERED this 8th day of September, 2014.


**TERENCE KERN**
**United States District Judge**